J. S08023/16 & J. S08024/16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA,   :     IN THE SUPERIOR COURT OF
                                            :            PENNSYLVANIA
                                            :

                v.                      :
                                            :

RONALD HUNTER,                    :
                                            :

             Appellant         :       No. 1027 WDA 2015

Appeal from the Order Dated June 11, 2015
In the Court of Common Pleas of Fayette County
Criminal Division No(s).: CP-26-CR-0000202-2015

COMMONWEALTH OF PENNSYLVANIA,   :     IN THE SUPERIOR COURT OF
                                             :            PENNSYLVANIA
                                            :

                v.                      :
                                            :

RONALD HUNTER,                    :
                                            :

             Appellant         :       No. 1332 WDA 2015

Appeal from the Judgment of Sentence August 12, 2015
In the Court of Common Pleas of Fayette County
Criminal Division No(s).: CP-26-CR-0000202-2015

BEFORE: STABILE, J., DUBOW, J., and MUSMANNO, J.

MEMORANDUM BY DUBOW, J.:                      **FILED MAY 4, 2016**

Appellant, Ronald Hunter, appeals from the judgment of sentence entered in the Fayette County Court of Common Pleas following a jury trial and conviction for Involuntary Deviate Sexual Intercourse by Forcible Compulsion, Aggravated Indecent Assault without Consent, Aggravated

Indecent Assault by Forcible Compulsion, Indecent Assault without Consent, and Indecent Assault by Forcible Compulsion.[1]

The sexual assault allegedly occurred in the home of D.B. ("Complainant"), so Complainant was the only witness to the assault. Complainant, however, failed to appear at both the Preliminary Hearing and the trial. The trial court, however, permitted two witnesses at trial to testify about statements that Complainant made to them regarding the sexual assault. We reverse this decision of the trial court and grant a new trial because the testimony of the two witnesses regarding the Complainant's description of the sexual assault violated Appellant's Sixth Amendment rights.

## **Factual and Procedural History**

On November 4, 2014, the police charged Appellant with the above crimes.[2] The trial court held a preliminary hearing on February 17, 2015. The victim failed to appear at the Preliminary Hearing, but the court held Appellant over on the charges.

---

[1] 18 Pa.C.S. § 3123(a)(1; 18 Pa.C.S. § 3125(a)(1); 18 Pa.C.S. § 3125(a)(2); 18 Pa.C.S. § 3126(a)(1); 18 Pa.C.S. § 3126(a)(2), respectively.

[2] Appellant was also charged with Aggravated Assault, 18 Pa.C.S. § 2702(a)(1), and Simple Assault, 18 Pa.C.S. § 2701(a)(1). The trial court dismissed those charges at the close of the Commonwealth's case in chief after oral motion by Appellant's counsel.

The parties appeared for trial on June 1, 2015. Since the Commonwealth predicted that Complainant would again not appear to testify,[3] the Commonwealth requested that the court permit the testimony of two individuals to whom the victim made statements about the sexual assault.

In particular, the Commonwealth requested that the court permit Michael Bittner, City of Uniontown police officer, and Ashley Stalnaker, formerly an emergency room nurse at Uniontown Hospital, to testify about statements that the victim made to them about the sexual assault.

The Commonwealth argued that Complainant's statement to Officer Bittner was admissible as a present sense impression, an excited utterance, and a statement of physical condition. *See* Pa.R.E. 803(1-3). The Commonwealth similarly argued that Complainant's statement to Nurse Stalnaker was admissible because Complainant gave the statement for purposes of medical treatment or diagnosis. *See* Pa.R.E. 803(4).

Appellant's counsel opposed the motion, arguing that testimony about Complainant's statements did not fall within an exception to the Hearsay Rule. Appellant's counsel further argued that the Sixth Amendment precluded the witnesses from testifying about Complainant's statements

---

[3] The record is devoid of any evidence as to the reason the prosecutor was unable to secure the victim's appearance at the Preliminary Hearing or trial.

because Appellant would not have the opportunity to confront and cross-examine his accuser. **See** U.S. Const. amend. VI.; Pa. Const., Article I, § 9.

The trial court deferred ruling on the Commonwealth's Motion to Admit the testimony of Bittner and Stalnaker until the Commonwealth presented it.

Six witnesses testified at trial on behalf of the Commonwealth: Bittner; Stalnaker; Jeremy Schult, City of Uniontown police officer; Michelle Barch, a serology analyst at the State Police Greensburg Crime Lab; Beth Ann Holsopple, a forensic DNA scientist at the Greensburg Crime Lab, specializing in DNA analysis; and Complainant's son. As predicted, the prosecutor was unable to secure Complainant's attendance at trial.

On the first day of the two-day trial, Officer Bittner testified to the facts as follows. At 10:10 PM on October 10, 2014, Officer Bittner and his patrol partner Officer Schult, were dispatched to Complainant's apartment in response to a 9-1-1 hang-up call. N.T., 6/1/15, pp. 20-22. The police officers arrived approximately four minutes later, knocked on Complainant's closed door, and waited for a response. **Id.** at 21. Receiving none, they tried the doorknob, found it unlocked, and entered the apartment. **Id.** Officer Bittner testified that, upon entering Complainant's apartment, he observed Complainant and Appellant. **Id.**

Officer Bittner testified, "[Appellant] was seated at a table straight to the back of the apartment. And there was an elderly female in front of him … who was on her knees with her hands on a chair. She had pajama tops on

but she was naked from the waist down." *Id.* at 22. Officer Bittner testified that Complainant's breathing appeared "rapid," and she seemed "upset over something, worried." *Id.* at 23-24.

Officer Bittner testified that as soon as he opened Complainant's apartment door, he asked her what was going on and the reason for calling the police. *Id.* at 24-25. Complainant answered him within 30 seconds or one minute after he arrived. *Id.* at 26.

Officer Bittner explained that he then helped Complainant off the floor because she required assistance. *Id.* at 24-25. At that time, Officer Schult took Appellant into the hallway while Officer Bittner spoke with Complainant inside her apartment. *Id.* at 26. Officer Bittner testified that within two or three minutes after the officers' arrival at Complainant's apartment, in response to his questioning her, Complainant recounted to him what had happened. *Id.* Specifically, Officer Bittner testified that he asked Complainant, "[w]hat happened? Tell me what happened here." *Id.* at 27.

At this point in the trial, the Commonwealth sought to introduce the statement Complainant made to Officer Bittner. *Id.* at 28. Appellant's counsel reasserted her objection to this testimony as hearsay, as an impermissible violation of Appellant's constitutional rights, and because the Commonwealth had not developed the *corpus delicti* of the case. *Id.*

After considering counsel's objections, the trial court overruled them and permitted Officer Bittner to testify about the contents of the statement that Complainant made to him. *Id.* at 30-32.

Officer Bittner testified that after he and Officer Schult separated Complainant and Appellant, Complainant said, "he's trying to rape me." *Id.* at 33-34. According to Officer Bittner, the victim told him that her pants were in her bedroom where Appellant had removed them from her. *Id.* at 34. Officer Bittner continued testifying about the victim's statement:

> Specifically she stated that [Appellant] is a friend that came over to her apartment. She went into the bedroom to get a cigarette. [Appellant] followed her into the bedroom and pushed her onto the bed. She stated that she told him to get off of her. He stated that he can do what he wants. They roll off of the bed during the struggle onto the floor. [Appellant] landed on top of [Complainant]. She told me that [Appellant] took her pants off and began to give her oral sex. She said she was kicking him at the time and trying to get him off of her. She described that she found a large, or a shoe with a large heel on it under her bed and that she took that out and hit [Appellant] with it. She stated that eventually she had gotten him off of her where he proceeded to drag her towards the living room. She reported that she grabbed a knife from the kitchen area and threatened him with it and that [Appellant] took the knife off of her and threw it onto the floor in the hallway. She then stated that she picked up a large fork and threatened to gouge his eyes out with it.

*Id.* at 35-36.

Officer Bittner testified that he walked around Complainant's apartment to corroborate her statement and he saw pajama bottoms matching the top she was wearing at the foot of the bed on the left side. *Id.*

He also reported seeing a two-pronged fork on the coffee table in the living room, a steak knife on the floor in the hallway leading into the bedroom, and a boot with a large heel close to the bottom of the bed. *Id.*

Next, Officer Bittner testified that he arranged for Complainant to be brought to the hospital and that he and Officer Schult assisted Complainant in dressing. *Id.* at 40.

On the second day of trial, Nurse Stalnaker testified. Appellant's counsel objected to Nurse Stalnaker's testimony on the same grounds as Bittner's testimony—namely that the portions of it relating to the victim's statement were hearsay and on Sixth Amendment grounds because Appellant would not have the opportunity to confront and cross-examine his accuser. *Id.* at 76-77, 88.

The court overruled this objection and permitted Nurse Stalnaker to testify, concluding that Nurse Stalnaker's testimony constituted a statement made for medical diagnosis or treatment. *Id.* at 77-79, 88; Pa.R.E. 803(4). The trial court was specific in limiting Nurse Stalnaker's testimony to "only the statements the patient gave that deal with what occurred so that the nurse may get a proper background for a medical diagnosis and for treatment only." N.T. at 88.

Nurse Stalnaker testified that when Complainant originally presented at the hospital she was distraught and anxious, but alert. *Id.* at 96. Nurse Stalnaker further testified that she was the nurse who received and treated

Complainant at Uniontown Hospital on the morning of October 11, 2014, and performed a sexual assault examination on Complainant. *Id.* at 85.

Nurse Stalnaker indicated that the purpose of taking Complainant's statement as part of the exam was to assist her in treating and diagnosing Complainant. *Id.* at 89. Reading from a copy of the sexual assault exam report prepared by Nurse Stalnaker at the time she conducted the exam, Nurse Stalnaker testified as follows:

> Patient states that the actor entered her apartment swearing at her. Patient states that the actor then passed her a joint and told her to smoke it. Patient states that she took one puff and told him she did not want it. Patient states that the actor told her the joint would make her feel good.
>
> The patient states that she told him she did not want it because she did not know what he put in it. The patient then states that she went into her bedroom to get a cigarette, and that the actor followed her and pushed her onto the bed. She states that she told him to get off of her. The patient states that the actor told her that he will do what he wants, in quotations.
>
> Patient states that they both rolled off of the bed and onto the floor. The actor then pulled the patient's pajama bottoms and undergarments off. The patient states that the actor performed oral sex on her while she was kicking and hitting him. The patient states that he was trying to spread her legs and she continued kicking him. The patient states the she told him she was going to call the police. The actor then got off of the patient and the patient called 9-1-1.
>
> . . . the patient stated that the offender held her hands and also restrained her body.
>
> I asked the patient whether or not she scratched the offender. Her response was yes. We also then asked what

location this occurred, and she replied she scratched him on the face.

*Id.* at 89-92.

Next Nurse Stalnaker testified that Complainant told her Appellant licked her vagina and penetrated her vagina orally and digitally. *Id.* at 92. She testified that Complainant denied that there was any ejaculation. *Id.* Nurse Stalnaker testified that she collected forensic evidence from Complainant and her clothing and placed it in an evidence kit for processing. *Id.* at 93-94.

Nurse Stalnaker recounted that Complainant was about to be discharged from the hospital when Nurse Stalnaker observed Complainant become "slightly wobbly and unsteady on her feet." *Id.* at 96. She further observed Complainant having weakness on her left side. *Id.* at 97. Nurse Stalnaker concluded Complainant was having a stroke. *Id.* Complainant was then transferred to another hospital by helicopter.[4]

On cross-examination, Nurse Stalnaker testified that she did not observe any signs of the kind of physical trauma often associated with sexual assault when she examined Complainant. *Id.* at 102-103. She also testified that she did not see any injuries on Complainant's arms and that

---

[4] Complainant's son testified that Complainant spent one month at University of Pittsburgh Medical Center-Presbyterian followed by a little over a month at a rehabilitation facility, before Complainant ultimately moved to South Carolina to live with her daughter, where she remained as of the date of the trial. N.T. at 112.

Complainant did not indicate that she had hit her head. *Id.* at 101, 103. Nurse Stalnaker reported Complainant tested positive for opiates and marijuana, but not for alcohol. *Id.* at 104- 105.

Officer Schult testified that Appellant told him that he went to Complainant's apartment because he believed there was a possibility that he and Complainant might have sex that night, but that no sexual contact of any kind took place. *Id.* at 118-119, 122. Officer Schult testified that Appellant stated that Complainant had fallen on her bedroom floor and he had fallen on top of her. *Id.* at 119-121. Officer Schult also testified that he believed Appellant and Complainant had been in a relationship at some point. *Id.* at 122.

With respect to forensic evidence, the Commonwealth's witness Holsopple testified that DNA found in saliva retrieved from Complainant's underwear and a DNA sample found under Complainant's right hand fingernail matched Appellant's DNA. *Id.* at 133, 135. Barch, the serology witness, testified that no seminal material was found on Complainant and that tests for the presence of blood were inconclusive. *Id.* at 61, 68.

At the close of the Commonwealth's case, Appellant's counsel made a Motion for Judgment of Acquittal. The trial court granted the motion as to the Aggravated Assault and Simple Assault charges, but denied the motion as to the other charges. *Id.* at 151-154. Appellant did not testify at trial and the defense did not put on any evidence.

The jury convicted Appellant on June 2, 2015. Following his conviction, Appellant filed a Motion for Judgment of Acquittal in which he reiterated the objections counsel had made on the record at trial to the admission of testimony that he alleged violated his Sixth Amendment protections. On June 11, 2015, the trial court denied the motion.

On August 12, 2015, the court sentenced Appellant to a term of ten to twenty years' incarceration for the Involuntary Deviate Sexual Intercourse by Forcible Corruption conviction,[5] and ordered Appellant to register for life under Pennsylvania's Sexual Offender Registration and Notification Act.[6] On August 17, 2015, Appellant filed a timely Post-Sentence Motion, which the court denied on August 20, 2015. Appellant timely appealed[7] and timely filed a court-ordered Pa.R.A.P. 1925(b) statement.

### Issues on Appeal

Appellant raises the following issues:

> Was the evidence insufficient to sustain conviction based upon the testimony and evidence presented at trial by the Commonwealth and the Commonwealth failed to present testimony of victim, Dora Branch?

---

[5] The trial court accepted Appellant's guilty verdicts on the other counts without imposing a further penalty.

[6] 42 Pa.C.S. § 9799.10, *et seq*.

[7] On July 6, 2015, Appellant filed a Notice of Appeal at No. 1027 WDA 2015 from the June 11, 2015 interlocutory order denying his Motion for Judgment of Acquittal. We elect to consolidate *sua sponte* the appeals for purposes of resolution.

Did the lower court violate the Confrontation Clause of the Sixth Amendment by allowing hearsay testimony?

Appellant's Brief at 8.

## Legal Analysis

**Sufficiency of the Evidence Challenge**

Appellant first challenges whether the Commonwealth presented sufficient evidence for a jury to convict him of Involuntary Deviate Sexual Intercourse by Forcible Compulsion, Aggravated Indecent Assault without Consent, Aggravated Indecent Assault by Forcible Compulsion, Indecent Assault without Consent, and Indecent Assault by Forcible Compulsion. Specifically, Appellant complains that the Commonwealth did not present any direct evidence to establish Appellant's guilt, that the jury was confused and could not have found Appellant guilty beyond a reasonable doubt, that the testimony at trial was inconsistent and contradicted by the physical evidence, and that the evidence was speculative and unreliable. ***Id.*** at 11, 13-15.

In reviewing the sufficiency of the evidence, our standard of review is as follows:

> The standard of review for a challenge to the sufficiency of the evidence is to determine whether, when viewed in a light most favorable to the verdict winner, the evidence at trial and all reasonable inferences therefrom is sufficient for the trier of fact to find that each element of the crimes charged is established beyond a reasonable doubt. The Commonwealth may sustain its burden of proving every

element beyond a reasonable doubt by means of wholly circumstantial evidence.

The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubt raised as to the accused's guilt is to be resolved by the fact-finder. As an appellate court, we do not assess credibility nor do we assign weight to any of the testimony of record. Therefore, we will not disturb the verdict unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.

*Commonwealth v. Vogelsong*, 90 A.3d 717, 719 (Pa. Super. 2014) (citations and quotations omitted).

We have reviewed the record in this case and conclude that, in light of the court's evidentiary rulings, the jury as fact-finder had sufficient evidence on which to base Appellant's convictions. In conducting our review, we find the trial court ably addressed and analyzed Appellant's sufficiency arguments in its Rule 1925(a) Opinion. *See* Trial Ct. Op., 9/14/15, at 8-11. We therefore adopt the opinion as our own.

**Sixth Amendment Challenge**

Appellant next challenges the trial court's decision to admit the testimony of Officer Bittner and Nurse Stalnaker over Appellant's Sixth Amendment objections. [8] *Id*. at 21, 28. We agree with Appellant that the

---

[8] To the extent that Appellant purports to challenge the trial court's ruling permitting Bittner and Stalnaker to testify to Complainant's statements to them over Appellant's hearsay objections, we find this argument undeveloped and, therefore, waived. *See* Pa.R.A.P. 2119(b), (c). Even if they were not waived, our review indicates that testimony satisfies the

Sixth Amendment prohibits these witnesses from testifying about statements Complainant made to them about the sexual assault and the trial court erred as a matter of law in allowing these witnesses to testify about them.

Because Appellant's constitutional challenge raises a question of law, our standard of review over the trial court's admission of the contested testimony is *de novo* and our scope of review is plenary. **See Commonwealth v. Yohe**, 39 A.3d 381, 384 (Pa. Super. 2012).

The Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, mandates that "[i]n all criminal prosecutions, the accused shall enjoy . . . the right to be confronted with the witnesses against him." U.S. Const. amend. VI.[9]

The Supreme Court of the United States has interpreted the Confrontation Clause to prohibit the admission of "testimonial" statements of

---

hearsay exceptions **See** Pa.R.E. 803(1-4). Moreover, "hearsay that is offered against a defendant under an exception from the hearsay rule . . . may sometimes be excluded because its admission would violate the defendant's right 'to be confronted with the witnesses against him' under the Sixth Amendment of the United States Constitution, or 'to be confronted with the witnesses against him' under the Article I, § 9 of the Pennsylvania Constitution." Daniel J. Anders, Ohlbaum on the Pennsylvania Rules of Evidence § 802.02 (2016 ed.).

[9] The Pennsylvania Constitution includes a right of confrontation. **See** Pa. Const., Article I, § 9 ("in all criminal prosecutions the accused hath a right to be heard by himself and his counsel [and] to be confronted with the witnesses against him"). But, because Appellant does not argue that Article I, section 9 provides him with greater protection than the Sixth Amendment, we will treat the state and federal provisions as coextensive for purposes of our review. **See Commonwealth v. Kratsas**, 764 A.2d 20, 27 n. 5 (Pa. 2001).

a witness who did not appear at trial unless the witness was unavailable and the defendant had a prior opportunity to cross-examine the witness. **Crawford v. Washington**, 541 U.S. 36, 68 (2004). In contrast, the Supreme Court has held that "non-testimonial statements are admissible, however, regardless of whether the witness is available or was subjected to cross-examination." **See Davis v. Washington**, 547 U.S. 813, 827-829 (2006).

In 2006, the Supreme Court, in **Davis v. Washington**, 547 U.S. 813 (2006), provided guidance on the distinction between testimonial and non-testimonial statements in the Confrontation Clause context. The **Davis** Court explained that, "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." **Davis**, 547 U.S. at 822.

In contrast, statements are testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." **Id.**

The U.S. Supreme Court in **Davis** addressed the factors a court should consider when determining whether a statement a person made to a third party is testimonial or non-testimonial. The **Davis** Court concluded that a

statement is more likely to be testimonial, and violative of a defendant's Sixth Amendment rights, when:

1. the interrogation giving rise to the statement was designed primarily to establish a past fact;

2. the alleged victim made the statement in an environment that was tranquil or safe;

3. the alleged victim and perpetrator are not in proximity to each other;

4. the victim gives the statement in the past tense in narrative form; and

5. some time passes between the events described and the statement is made.

*Id.* at 827, 828-29, 831-32.

Conversely, the Supreme Court concluded a statement is more likely to be nontestimonial, and given to meet an ongoing emergency, when:

1. it was given to describe current circumstances requiring police assistance;

2. the environment was unsafe or chaotic;

3. the alleged victim and perpetrator were in proximity to each other when the statement was made; and

4. the statement was given in the present tense.

*Id.* The Court drew a fine distinction between a circumstance where a person gives a statement to determine either "what is happening" (nontestimonial) and "what has happened" (testimonial). *Id.* at 830.

Applying these principles, the Supreme Court in *Davis* concluded that the alleged victim's statements to a 9-1-1 operator was nontestimonial because the alleged victim made it not to "establish or prove some past fact, but to describe current circumstances requiring police assistance." *Id.* at 827. Furthermore, the alleged victim "was speaking about events *as they were actually happening*, rather than describing some past event[ ]" and in an environment that was not tranquil or safe. *Id.* at 827 (citation omitted, emphasis in original). The Court concluded that the victim was facing an ongoing emergency and, "[a]lthough one *might* call 911 to provide a narrative report of a crime absent any imminent danger, the alleged victim's call was plainly a call for help against a bona fide physical threat." *Id.* at 827 (emphasis in original).

In contrast, however, the Court concluded that other statements to the police officers were testimonial because "[t]here was no emergency in progress[ ]" and "interrogation was conducted in a separate room, away from her husband." *Id.* at 829.

In drawing a parallel to the declarant in *Crawford*, the *Davis* Court concluded that the statements of the victims in both cases were "testimonial" because "both declarants were actively separated from the

defendant. Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed." *Id.* at 830. When the police officers questioned the victim they were seeking to determine not "what is happening, but rather, what happened." *Id.* (quotation marks omitted). The Court concluded that "[s]uch statements under official interrogation are an obvious substitute for live testimony because they do precisely *what a witness does* on direct examination; they are inherently testimonial." *Id.* (emphasis in original).

In light of the framework provided to us by the Court in ***Davis***, we conclude that Complainant's statements to Officer Bittner were testimonial in nature. The scene as described by Officer Bittner upon his arrival with Officer Schult at Complainant's home was tranquil. ***See generally***, N.T. at 21-24. There is no indication that Officer Bittner perceived there to be an ongoing emergency in progress as it was not immediately apparent that Complainant was in danger.

When Officer Bittner arrived at Complainant's house, Complainant and Appellant were calm enough that Officer Bittner was able to ask Complainant and Appellant about the events that transpired and the reasons someone called the police. *Id.* at 24-25. Additionally, Officer Bittner and Officer Schult separated Complainant and Appellant before Officer Bittner began interrogating Complainant about the events that had transpired. *Id.* at 26.

More significantly, the statement that Complainant gave to Officer Bittner was a narrative about past events, not a description of current events requiring immediate police assistance. Officer Bittner testified that he asked Complainant, "[w]hat happened?  Tell me what happened here." *Id.* at 27.

Moreover, Complainant's statement, as testified to by Officer Bittner, amounted to "an obvious substitute for live testimony" because it replicated the testimony Complainant would have stated during direct examination if she appeared at the trial, *i.e.* she described not "what is happening," but rather, "what happened." *Id.*

Therefore, the trial court violated Appellant's Sixth Amendment to confront Complainant when it permitted Officer Bittner's testimony to testify about Complainant's narrative about the sexual assault.  *See Crawford*, 541 U.S. at 68.

We note that the prosecutor presented no evidence and the trial court made no finding about Complainant's unavailability. Since we find that the testimony that Officer Bittner made about Complainant's statements were "testimonial," we do not need to analyze whether Complainant's failure to appear at trial met the standard for "unavailability."[10]

---

[10] In his post-trial Motion for Judgment of Acquittal, post-sentence Motion for Judgment of Acquittal, and appellate Brief, Appellant asserts that, "[t]he Commonwealth has utterly failed to prove that the alleged victim actually existed or was unavailable." *See* Mot. for Judgment of Acquittal, 6/9/15, at

For purposes of the Confrontation Clause analysis, we similarly conclude that Complainant's statements to Nurse Stalnaker were testimonial in nature and the trial court should not have admitted them. Nurse Stalnaker's testimony demonstrates that Complainant was narrating past events in a quiet and safe environment, out of the presence of Appellant, and after some time had elapsed since the alleged incident. Therefore, the trial court violated Appellant's Sixth Amendment right to confront the witnesses against him when it permitted Nurse Stalnaker's to testify about Complainant's statements to her. *See Crawford*, 541 U.S. at 68.

Judgment of sentence vacated. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/4/2016

---

3 (unpaginated); Mot. for Judgment of Acquittal, 8/17/15, at 4 (unpaginated); Appellant's Brief at 28. However, the trial court did not develop a record with respect to Complainant's unavailability and Appellant did not raise this issue in his Rule 1925(b) statement. Accordingly we will not address it here. Pa.R.A.P. 1925(b)(4)(vii); *see also Commonwealth v. Hill*, 16 A.3d 484 (Pa. 2011) (any appellate issues not raised in a Rule 1925(b) statement are waived).

IN THE COURT OF COMMON PLEAS OF FAYETTE COUNTY,
PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,  : CRIMINAL ACTION

    v.  :

RONALD HUNTER,  : NO. 202 OF 2015

    Defendant/Appellant.  :

_____ : JUDGE JOSEPH M. GEORGE, JR.

**ATTORNEYS AND LAW FIRMS**

Meghann Mikluscak, Esquire, Assistant District Attorney, *For the Commonwealth*

Mary Campbell Spegar, Esquire, Assistant Public Defender, *For the Appellant*

# OPINION

GEORGE, J.                                                          September 14, 2015

Following a trial by jury, Appellant, Ronald Hunter, was found guilty of Involuntary Deviate Sexual Intercourse by Forcible Compulsion,[1] Aggravated Indecent Assault without Consent,[2] Aggravated Indecent Assault by Forcible Compulsion,[3] Indecent Assault without Consent,[4] and Indecent Assault by Forcible Compulsion.[5]  On August 12, 2015, Appellant was sentenced to a term of

---

[1] 18 Pa. C.S. § 3123(a)(1).

[2] 18 Pa. C.S. § 3125(a)(1).

[3] 18 Pa. C.S. § 3125(a)(2).

[4] 18 Pa. C.S. § 3126(a)(1).

[5] 18 Pa. C.S. § 3126(a)(2).

1

imprisonment for a period of not less than ten (10) years nor more than twenty (20) years. Moreover, Appellant was informed of his duty to register for life under Pennsylvania's Sexual Offender Registration and Notification Act (SORNA).[6] Appellant filed a timely post-sentence motion and this Court denied same. This Opinion is in support of the jury verdict.

## CONCISE ISSUES

Appellant filed the following Statement of Errors Complained of on Appeal:

1. WAS THE EVIDENCE INSUFFICIENT TO SUSTAIN CONVICTION BASED UPON THE TESTIMONY AND EVIDENCE PRESENTED AT TRIAL BY THE COMMONWEALTH AND THE COMMONWEALTH FAILED TO PRESENT TESTIMONY OF VICTIM, DORA BRANCH?

2. DID THE LOWER COURT VIOLATE THE CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT BY ALLOWING HEARSAY TESTIMONY?

## FACTS

On October 10, 2014, Officer Bittner and Officer Schult of the Uniontown City Police Department were dispatched to apartment 508 of Mount Vernon Towers in Uniontown on a 9-1-1 hang-up call. (T.T. pp. 19-21, 116-117). Upon arrival, the officers knocked on the door and announced their presence. (T.T. pp. 21, 117). After waiting "a little while" and hearing no noise coming from the apartment, the officers noticed the door was unlocked. (T.T. pp. 21, 117).

Officers Bittner and Schult entered the apartment and observed Appellant sitting at a round table to the back of the apartment. (T.T. pp. 22, 117-118). In front of Appellant was Dora Branch, a seventy-six year old woman. She was on her knees

---

[6] 42 Pa. C.S. § 9799.10 *et seq.*

2

with her hands on a chair and naked from the waist down. (T.T. pp. 22, 118). Officer Bittner asked what was going on; neither Appellant nor Branch answered. (T.T. pp. 25, 120-121). At that time, the officers thought it was best to separate the two parties. Officer Schult escorted Appellant out into the hallway and Officer Bittner stayed inside the apartment with Branch. (T.T. pp. 26, 118).

Officer Bittner knelt down and asked Branch what happened. Branch responded that Appellant was trying to rape her. (T.T. p. 33). Officer Bittner assisted Branch in moving to the couch. (T.T. pp. 25-26). At that time, Branch explained what happened, which Officer Bittner testified to at trial as follows:

> [S]he stated that [Appellant was] a friend that came over to her apartment. She went into the bedroom to get a cigarette. [Appellant] followed her into the bedroom and pushed her onto the bed. She stated that she told him to get off of her. He stated he can do what he wants. They roll off of the bed during the struggle onto the floor. [Appellant] landed on top of Miss Branch. She told me that [Appellant] took her pants off and began to give her oral sex. She said she was kicking him at the time and trying to get him off of her. She described that she found a large, or a shoe with a large heel on it under her bed and that she took that out and hit [Appellant] with it. She stated that eventually she had gotten him off of her where he proceeded to drag her towards the living room. She reported that she grabbed a knife from the kitchen area and threatened him with it, and that [Appellant] took the knife off of her and threw it onto the floor in the hallway. She then stated that she picked up a large fork and threated to gouge his eyes with it. She stated at that point she was able to get to the phone and dial 9-1-1 which is when we were dispatched.

(T.T. pp. 35-36).

3

After this brief discussion with Branch, Officer Bittner noticed a boot with a large heel and Branch's pajama bottoms at the foot of the bed and a steak knife on the floor in the hallway leading into the bedroom. (T.T. p. 37).

At the same time that Officer Bittner assisted Branch, Officer Schult spoke with Appellant. Appellant told Officer Schult that he anticipated he was going to have sex with Branch that night but that nothing happened. (T.T. pp. 118-119). He did say that Branch rolled off the bed and he fell on top of Branch. (T.T. pp. 119-120). However, he said that he did not have any sexual contact with Branch. (T.T. p. 119).

Officer Bittner contacted EMS to transport Branch to Uniontown Hospital to seek further treatment. (T.T. p. 40). Once she arrived at the hospital, Branch was physically distraught and anxious, yet alert. (T.T. p. 96). She was treated by Ashley Stalnaker, an Emergency Room Nurse. As part of determining treatment and diagnosis, Ms. Stalnaker conducted a sexual assault examination of Branch. Branch gave Ms. Stalnaker a statement, which Ms. Stalnaker testified to at trial as follows:

> Patient states that the actor entered her apartment swearing at her. Patient states that the actor then passed her a joint and told her to smoke it. Patient states that she took one puff and told him she did not want it. Patient states that the actor told her the joint would make her feel good.
>
> The patient states that she told him she did not want the joint because she did not know what he put in it. The patient then states that she went into her bedroom to get a cigarette, and that the actor followed her and pushed her onto the bed. She states that she told him to get off of her. The patient states that the actor told her that he will do what he wants, in quotations.

4

Patient states that they both rolled off of the bed and onto the floor. The actor then pulled the patient's pajama bottoms and undergarments off. The patient states that the actor performed oral sex on her while she was kicking and hitting him. The patient states that he was trying to spread her legs and she continued kicking him. The patient states that she told him she was going to call the police. The actor then got off of the patient and the patient called 9-1-1.

(T.T. pp. 90-91). Branch also told Ms. Stalnaker that there was oral contact, licking of her vagina, and vaginal penetration by the actor's fingers and tongue. (T.T. p. 92).

Ms. Stalnaker also collected items for the sexual assault kit, including Branch's clothing, fingernail clippings, scrapings under each fingernail, hairs from Branch's head and pubic area, as well as vagina, rectal, and mouth swabs. (T.T. pp. 93-94).

Later, Branch became physically weak, appearing wobbly and unsteady on her feet. (T.T. p. 96). She needed a wheelchair to get her from her bed to the restroom. (T.T. p. 97). Within forty minutes after using the restroom, Ms. Stalnaker went to Branch's room. (T.T. p. 97). With the intent to discharge Branch, Ms. Stalnaker checked Branch's vital signs. (T.T. p. 97). Ms. Stalnaker noticed weakness on the left side of Branch's body, including Branch's inability to lift her left arm. (T.T. pp. 97-98). This unilateral weakness indicated to Ms. Stalnaker that Branch was possibly having a stroke. (T.T. pp. 97-98).

After sharing her observations with the Dr. Briggs, the attending physician, he and Ms. Stalnaker did a full neurological exam on Branch and she was taken for a CT exam. (T.T. pp. 98-99). Once the CT test was completed, Ms. Stalnaker placed

the patient on a cardiac monitor, placed her on oxygen, inserted an IV, and drew blood as part of the hospital's stroke protocol. (T.T. p. 99). Finally, when the results of the CT scan came back, Branch was transferred from Uniontown Hospital to UPMC-Presbyterian by Stat Medevac, a medical helicopter, at approximately 5:30 a.m.[7] (T.T. pp. 95, 99).

The items collected by Ms. Stalnaker, as well as a buccal swab from Appellant, were sent to the State Police Greensburg Crime Lab. The items were first assigned to Michelle Barch, a serologist with the Greensburg Crime Lab who was recognized at trial as an expert in the field of serology.[8] (T.T. pp. 57-58). The serology department did not test DNA; rather, it prepared the samples that were then forwarded to the DNA laboratory. (T.T. p. 60). Ms. Barch concluded that no seminal fluid was detected in the vaginal, rectal, and oral samples nor on Branch's underwear or bra. (T.T. pp. 61-63). No serology testing was done on the fingernail clippings and scrapings because there was no indication of any seminal material or saliva on Branch's hands. (T.T. p. 63). Finally, the pubic and head hair combings were not suitable for DNA testing because there was no root on the hair. (T.T. p. 64).

After the serology testing, the items were sent to the DNA Laboratory, where Beth Ann Holsopple, recognized at trial as an expert in DNA analysis, conducted the

---

[7] Branch spent approximately one month at UPMC-Presbyterian. She then went to a rehabilitation center for another month. After that, she moved to South Carolina where she currently resides with her daughter. (T.T. pp.112-113).

[8] Serology is the detection and identification of bodily fluids which include blood, semen, saliva, urine, and feces, as well as hair identification and bloodstain pattern analysis. (T.T. p. 55).

DNA analysis. (T.T. p. 130). Ms. Holsopple's analysis concluded that the sample from Branch's underwear had the DNA of two individuals on it, Branch and Appellant. (T.T. p. 133). While there was too little DNA to make a determination on the left hand fingernails and scrapings, the samples from the right hand indicated a match of Branch and Appellant's DNA. (T.T. pp. 134-135).

Branch did not appear at any criminal proceedings, including the trial. However, this Court allowed Officer Bittner and Ms. Stalnaker to testify about the statements made to them by Branch over Appellant's objections. On Tuesday June 2nd, 2015, Appellant was found guilty. On June 9, 2015, Appellant filed a written motion for judgment of acquittal. Said motion was denied on June 11th, 2015. On July 6th, 2015, Appellant appealed this Court's Order denying said motion at 1027 WDA 2015. This Court issued a Statement in Lieu of Opinion on July 14th, 2015, respectfully requesting the Superior Court to deny the appeal for being premature since Appellant was not sentenced. On August 12, 2015, Appellant was sentenced on Count 1, IDSI by Forcible Compulsion to a term of imprisonment for a period of not less than ten (10) years nor more than twenty (20) years. On the remaining Counts, this Court accepted Appellant's guilty verdicts without imposing a further penalty. On August 28, 2015, Appellant appealed from the judgment of sentence entered by this Court at 1332 WDA 2015.

## DISCUSSION

Appellant's first concise issue is whether the evidence presented at trial by the Commonwealth established sufficient evidence to sustain Appellant's guilty verdicts.

7

> The standard of review for a challenge to the sufficiency of the evidence is to determine whether, when viewed in a light most favorable to the verdict winner, the evidence at trial and all reasonable inferences therefrom is sufficient for the trier of fact to find that each element of the crimes charged is established beyond a reasonable doubt. The Commonwealth may sustain its burden of proving every element beyond a reasonable doubt by means of wholly circumstantial evidence.

> The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubt raised as to the accused's guilt is to be resolved by the fact-finder. [In this context, Courts] do not assess credibility nor . . . assign weight to any of the testimony of record. Therefore, we will not disturb the verdict unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.

*Commonwealth v. Vogelsong*, 90 A.3d 717, 719 (Pa. Super. 2014).

First, Appellant was found guilty of IDSI by Forcible Compulsion. One is guilty of this offense if the Commonwealth establishes beyond a reasonable doubt that deviate sexual intercourse took place by forcible compulsion. 18 Pa. C.S. § 3123(a)(1). Deviate sexual intercourse is defined as sexual intercourse per os or per anus between human beings, including penetration however slight. 18 Pa. C.S. § 3101. "In order to establish penetration, some oral contact is required. Moreover, a person can penetrate by use of the mouth or the tongue." *Commonwealth v. Wilson*, 825 A.2d 710, 714 (Pa. Super. 2003).

Branch told Officer Bittner that Appellant "took her pants off and began to give her oral sex." (T.T. pp. 35-36). She also told the attending nurse, Ms. Stalnaker, that there was "oral contact," "licking of her vagina," and vaginal penetration by "fingers

8

and tongue." (T.T. p. 92). These statements made by Branch are enough to establish that deviate sexual intercourse took place.

The Commonwealth also provided sufficient evidence that Appellant was the individual who performed oral sex on her. Along with statements to Officer Bittner that Appellant performed oral sex on Branch, Ms. Stalnaker conducted a sexual assault exam. The exam included a collection of items, including Branch's clothing, clippings of her fingernails, scrapings under each fingernail, as well as hairs from Branch's head and pubic area. These items were sent to the Forensic DNA Division of the Greensburg Laboratory. The items were tested for DNA matching by Ms. Holsopple. Her testimony concluded that evidence of Appellant's DNA was found on Branch's underwear as well as the clippings of Branch's right hand fingernails.

Finally, the Commonwealth proved beyond a reasonable doubt the element of forcible compulsion. In order to prove forcible compulsion, the Commonwealth is "required to establish beyond a reasonable doubt that Appellant used either physical force, a threat of physical force, or psychological coercion..." *Commonwealth v. Brown*, 556 Pa. 131, 136, 727 A.2d 541, 544 (1999). Here, physical force was established by Officer Bittner's testimony. Officer Bittner indicated there was a struggle between Branch and the victim. Specifically, Appellant pushed Branch onto a bed, at which time they rolled off onto the floor where Appellant landed on top of Branch. Appellant also removed Branch's pants and underwear and dragged her from the bedroom towards the living room. While this was happening, Branch was kicking and finding objects in the apartment to hit Appellant with to get him off of

9

her. Branch also reiterated to Ms. Stalnaker that a struggle took place. Therefore, sufficient evidence was provided by the Commonwealth to prove beyond a reasonable doubt Appellant's conviction of IDSI by Forcible Compulsion.

Appellant was also convicted of Aggravated Indecent Assault without Consent and Aggravated Indecent Assault by Forcible Compulsion. The Commonwealth thus had to provide sufficient evidence that Appellant engaged in penetration, however slight, of the genitals or anus of Branch without her consent and by forcible compulsion. Sufficient evidence provided by the Commonwealth included: (1) Branch's statement to Officer Bittner that she told him to get off of her, indicating lack of consent; (2) Branch's statement to Ms. Stalnaker that there was penetration by fingers and tongue; (3) Branch's statement that Appellant took her pants and underwear off of her and dragged her, indicating force; and (4) Ms. Holsopple's testimony explaining her report that Appellant's DNA was found on Branch's underwear and right hand fingernails.

This evidence was also enough to establish beyond a reasonable doubt that Appellant was guilty of Indecent Assault without Consent and Indecent Assault by Forcible Compulsion.

> A person is guilty of indecent assault if the person has indecent contact with the complainant, causes the complainant to have indecent contact with the person or intentionally causes the complainant to come into contact with seminal fluid, urine or feces for the purpose of arousing sexual desire in the person or the complainant and:
>
> (1) the person does so without the complainant's consent;

10

(2) the person does so by forcible compulsion

18 Pa. C.S. 3126(a)(1),(2). Indecent contact includes "[a]ny touching of the sexual or other intimate parts of the person for the purpose of arousing or gratifying sexual desire, in any person." 18 Pa. C.S. § 3101. As mentioned above, evidence was presented that there was vaginal penetration without Branch's consent and by forcible compulsion. Furthermore, Appellant told Officer Schult that there was a possibility that he and Branch would have sex that night, thus providing a reasonable inference that he performed oral sex for the purpose of arousing or gratifying sexual desire. Therefore, the Commonwealth provided sufficient evidence to sustain the guilty verdicts against Appellant.

Appellant's final concise issue is whether the Court violated the Confrontation Clause of the Sixth Amendment by allowing into evidence hearsay testimony. This issue relates to the admission of evidence at trial and the standard of review is as such:

> The admissibility of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon abuse of discretion. An abuse of discretion will not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. Moreover, an erroneous ruling by a trial court on an evidentiary issue does not necessitate relief where the error was harmless beyond a reasonable doubt.

11

*Commonwealth v. Travaglia*, 611 Pa. 481, 28 A.3d 868, 873-74 (2011) (citation omitted). Appellant asserts the Court erred by allowing Officer Bittner and Ms. Stalnaker to testify about statements made to them by Branch.

Hearsay is an out of court statement being offered for the truth of the matter asserted. Pa. R.E. 801(c). While hearsay statements generally do not come into evidence due to lack of trustworthiness, certain exceptions allow for admissibility based on the inherent reliability of the statements.

At trial, Branch's statement to Officer Bittner was admitted under the excited utterance exception. This exception applies when the declarant, while under the stress of excitement, makes a statement relating to a startling event. Pa. R.E. 803(2). The statement must be:

> a spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person had just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his reflective faculties.

*Commonwealth v. Stokes*, 532 Pa. 242, 258, 615 A.2d 704, 712 (1992). There exists no bright line rule on how much time may elapse from the time of the declarant's experience and her statement. *Commonwealth v. Carmody*, 799 A.2d 143, 147 (Pa. Super. 2002). However, regardless of time, the main question is whether the nervous excitement continued to dominate without giving the declarant the ability to reflect on the event. *Commonwealth v. Gore*, 396 A.2d 1302, 1305 (Pa. Super. 1978).

12

Here, Officer Bittner was dispatched at 10:00 pm and arrived on scene four minutes later. When he entered the apartment, he saw Branch on her knees, without any pants or underwear on, and with Appellant sitting at a table directly behind her. About two minutes after he arrived, Officer Bittner obtained a statement from Branch that Appellant pulled her pants down and started to perform oral sex on her, prompting her to fend off Appellant and call 9-1-1 for help.

This statement was made very close in time to the incident, at the scene of the incident, and in close proximity to Appellant. Although the statement was made in response to police questioning, this fact alone does not preclude the statement from being spontaneous. *Commonwealth v. Farrior*, 458 A.2d 1356, 1359 (Pa. Super. 1983). It is reasonable that with the surrounding circumstances, Branch was still under the stress of excitement when she made the statement to Officer Bittner. Thus, the statement met the standard of the excited utterance exception.

Appellant also argued that even if the statement was deemed admissible under a hearsay exception, allowing the statement to come into evidence violated his constitutional right to confront his accuser. The Supreme Court of the United States adopted a standard under the Confrontation Clause of the Sixth Amendment which prohibits the admission of testimonial statements of a witness who did not appear at trial unless: (1) the witness was unavailable; and (2) the defendant had a prior opportunity to cross examine the witness. *Crawford v. Washington*, 541 U.S. 36 (2004). There is no doubt that Branch was unavailable at trial and Appellant had no prior opportunity to cross-examine Branch. Therefore, the issue is whether the

13

statement to Officer Bittner was nontestimonial and thus admissible at trial. The Supreme Court defined the meaning of testimonial statements as such:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington*, 547 U.S. 813, 822 (2006).

In order to determine the primary purpose of the interrogation, the court must "objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties." *Michigan v. Bryant*, 562 U.S. 344, 359 (2011). "That is, the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had..." *Bryant*, 562 U.S. at 360. Lastly, an objective analysis requires the Court to look at the situation in the eyes of the interrogator and the declarant at the time the statements were given.

> The existence of an ongoing emergency must be objectively assessed from the perspective of the parties to the interrogation at the time, not with the benefit of hindsight. If the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief was later proved incorrect, that is sufficient for the purposes of the Confrontation Clause.

*Bryant*, 562 U.S. at 361 n.8.

14

Looking at the circumstances at the time the statement was given by Branch to Officer Bittner, evaluated objectively, the statement was given for the primary purpose of meeting an ongoing emergency. Officer Bittner and Officer Schult were dispatched to Branch's apartment on a 9-1-1 hang up call. Thus, prior to arriving at the apartment, the officers were unaware of the type of situation they were heading into and the condition of the parties. After Officers Bittner and Schult knocked on the door and announced they were police, they received no response. At this point, there was concern on the part of the police that no one was answering the door after receiving a 9-1-1 hang-up call from the apartment, as shown by Officer Schult's testimony. Rather than knocking again, the officers entered the apartment after determining the door was unlocked.

Getting their first observation of the situation, Officers Bittner and Schult noticed Branch naked from the waist down on her knees with Appellant sitting at a table behind her. Within two minutes on scene, Officer Schult escorted Appellant out of the apartment while Officer Bittner assisted Branch from the floor to the couch. It was at this point that Branch made a statement to Officer Bittner.

It was not until after Branch made a statement to the police that they were aware of the circumstances surrounding the incident. In *Davis*, the Supreme Court held the statement produced in that case was nontestimonial because instead of describing past events, the victim's statement was about events as they were actually happening. *Davis*, 547 U.S. at 827. However, the fact that Branch made statements about what happened minutes before the police arrived does not in and of itself

15

indicate a lack of an emergency situation. More often than not, in order for the police to effectively respond to and resolve an ongoing emergency, they have to know what happened. *See Bryant*, 562 U.S. at 376 (the questions the police asked – what had happened, who had shot him, and where the shooting occurred – were the exact type of questions necessary to enable them to meet an ongoing emergency).

As such, Officer Bittner's "interrogation" of Branch several minutes after the incident occurred was not for the primary purpose of proving past events. When looking at all the facts surrounding the events that occurred, Officer Bittner did not interrogate Branch to create a record for trial. Officer Bittner went into the situation blind. He did not know what he was responding to, he did not know who the assailant was, he did not know what, if any weapon was used, and he did not know whether Branch needed immediate medical attention. The only way for him to know the answers to those questions and how and what to do next to effectively respond to the situation was to surely ask the questions.

Furthermore, "it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation requires us to evaluate." *Davis*, 547 U.S. at 822 n.1. Branch did respond to questions asked by Officer Bittner and her answers explained past events. Nevertheless, it is reasonable to believe that Branch answered Officer Bittner not for the purpose of the statement to be used at a later criminal proceeding, but rather to assist her in seeking aid, comfort and immediate medical attention.

16

At the time of the incident, Branch was seventy-six years old. When Officer Bittner entered the apartment, Branch was neither wearing pants nor underwear. She was unable to stand on her own and required assistance in getting up off the floor and onto the couch. Officer Bittner also testified that Branch was breathing rapidly. Looking at the situation from the perspective of Branch at the time the statement was made, it is entirely reasonable to believe that Branch was not contemplating that her statements might later be used against Appellant in a criminal prosecution.

Moreover, the formality of the encounter between Branch and Officer Bittner also suggests the statement was not sought for later criminal proceedings. While this is not the key factor in the primary purpose inquiry, it is an important factor. *Commonwealth v. Allshouse*, 614 Pa. 229, 249, 36 A.3d 163, 175 (2012). The encounter was made a short time after the incident, at the scene of the incident, with Appellant standing right outside the apartment. This informality was to address what was perceived to be an ongoing emergency. Therefore, Officer Bittner's testimony regarding Branch's statement did not violate the Confrontation Clause.

This Court also took into consideration *Commonwealth v. Burrus*, 631 EDA 2013, unpublished memorandum (PA. Super. December 11, 2014). In *Burrus*, the trial court allowed into evidence the testimony of a police officer regarding a victim's statements moments after he was shot under the excited utterance exception. Similarly to the Appellant in this case, Burrus argued that the victim's declaration to the police was a testimonial statement made in violation of the Confrontation Clause. The Superior Court, citing *Michigan v. Bryant*, affirmed the decision of the

17

trial court and held that the statement was not testimonial within the meaning of the Confrontation Clause, but rather was an informal exchange where the police obtained basic information about the shooting, the location and identity of the shooter. Therefore, as in *Burrus*, the Confrontation Clause is not implicated in this matter.

Next, Appellant argues the statement given by Branch to Ms. Stalnaker should have also been inadmissible. The statement was admitted under the medical diagnosis or treatment hearsay exception. This exception exists when the statement:

> (A) is made for – and is reasonably pertinent to – medical treatment or diagnosis in contemplation of treatment; and

> (B) describes medical history, past of present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof, insofar as reasonably pertinent to treatment, or diagnosis in contemplation of treatment.

Pa. R.E. 803(4). Essentially, the statement must be necessary and proper for the purpose of receiving medical treatment. *Commonwealth v. Smith*, 545 Pa. 487, 493, 681 A.2d 1288, 1291 (1996). Such statements are admissible because a person who finds herself in need of medical treatment is presumed to give a reliable statement. This exception is limited to statements that are relevant for medical diagnosis and treatment. Therefore, statements that indicate who caused the injuries are irrelevant and impermissible. *Smith*, 545 Pa at 495, 681 A.2d at 1292.

Ms. Stalnaker was the treating nurse of Branch, maintained care of her while she was a patient at Uniontown Hospital, and performed the sexual assault exam. She used words such as 'actor' or 'individual' instead of making any reference to

18

Appellant. Ms. Stalnaker's testimony included Branch's admission that she took one puff of marijuana, prompting Appellant to object. Nevertheless, that statement was admitted as medically relevant since Ms. Stalnaker testified that taking illegal substances can affect the nature of treatment.

Additional testimony by Ms. Stalnaker revealed how Branch sustained her injuries. The testimony showed Branch stated that: (1) she was pushed onto a bed and then rolled off onto the floor; (2) her pajama bottoms and undergarments were pulled off of her; (3) oral sex was performed on her while she was kicking and hitting him; and (4) there was oral contact, including licking of her vagina and vaginal penetration by his fingers and tongue. (T.T. pp. 91-92). These statements were medically relevant for Ms. Stalnaker in treating Branch since an altercation between her and Appellant took place. Events surrounding an injury may be important for medical treatment or diagnosis. *Commonwealth v. Vining*, 744 A.2d 310, 319 (Pa. Super. 1999); *Commonwealth v. Fink*, 791 A.2d 1235, 1246 (Pa. Super. 2002). Therefore, Ms. Stalnaker's testimony regarding Branch's statements met the medical diagnosis or treatment exception to hearsay.

Appellant also asserts Branch's statement to Ms. Stalnaker violated his rights under the Confrontation Clause. Issues regarding the Confrontation Clause and statements made to medical providers have not been nearly as discussed as statements made to law enforcement personnel. *Crawford* and its progeny have heavily focused on interactions with the police. The difference regarding medical providers is that often times statements made between a medical provider

19

("interrogator) and a patient ("declarant") are neither for the purpose of meeting an ongoing emergency nor for the purpose of establishing past facts that may be later used at a criminal proceeding. Rather, these statements are made for the primary purpose of treating the patient.

Nevertheless, still keeping in mind the standard set by the Supreme Court on a Confrontation Clause analysis, we must determine whether the primary purpose of the statement was to meet an ongoing emergency or to establish past events that may later be used at a criminal proceeding. "The victim's medical state also provides important context for first responders to judge the existence and magnitude of a continuing threat to the victim..." *Bryant*, 562 U.S. at 365. Once Branch arrived at the hospital, Ms. Stalnaker maintained care of her and was the lead nurse of the sexual assault exam. While one role of a sexual assault nurse examiner may be to collect evidence, the primary goal is to treat the patient. Thus, Ms. Stalnaker's questioning of Branch was not solely for the purpose of collecting evidence, but mainly for treating the patient. *See State v. Stahl*, 111 Ohio St.3d 186, 855 N.E.2d 834 (statements made by a rape victim to a nurse during an emergency-room examination at the unit of hospital specializing in treating sexual assault victims were nontestimonial since the unit's prosecutorial function by collecting evidence was secondary to its primary motivation, which was care of its patients).

However, as mentioned above, the standard requires the trial court to make a final determination on the basis of the declarant's statement. An objective analysis would require this Court to determine whether Branch's primary purpose of giving

20

the statement to medical personnel, specifically Ms. Stalnaker, was to establish past events. After careful consideration, it is reasonable to conclude that Branch's primary purpose of giving her statement to Ms. Stalnaker was to seek treatment.

Ms. Stalnaker testified that Branch was physically distraught and anxious when she arrived at the hospital. The assault took place only a couple hours prior to arriving at the hospital. Additionally, as the night progressed, Branch's symptoms worsened, including weakness on the left side of her body to the point where she was unable to lift her left arm. After further testing, Branch was transported from Uniontown Hospital to UPMC-Presbyterian via Stat Medevac, a medical helicopter. Taking all of these circumstances into consideration, there is nothing in the record to establish that a reasonable person in Branch's position would believe that Ms. Stalnaker's primary role was an agent of the state in aiding a criminal prosecution. *See State v. Stahl*, 111 Ohio St.3d 186, 855 N.E.2d 834 (statements made by a rape victim to a nurse during an emergency-room examination at the unit of hospital specializing in treating sexual assault victims were not rendered testimonial for purposes of Confrontation Clause as nothing established that a reasonable person in victim's position would have believed that the unit served primarily as a prosecutorial function). Therefore, Ms. Stalnaker's testimony regarding Branch's statement did not violate the Confrontation Clause.

21

Wherefore, it is respectfully submitted that this appeal is without merit and should be denied.

BY THE COURT:

ATTEST:

_____
JOSEPH M. GEORGE, JR., JUDGE

_____
CLERK OF COURTS

FILED
2015 SEP 15 AM 11 59
JANICE SNYDER
FAYETTE COUNTY
CLERK OF COURTS

9-16-15 10:00
DIST/DATE

DEF_____
DA_____
PO_____
PD_____
WARD_____
SHER_____
CA_____
ATTY_____
CC_____
BKG.CTR._____
PROBATION_____
FAY. CO. BAR-R

22